IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

BLAKE COLLIER,
      Petitioner,

vs.                            Case No.:  5:12cv82/MMP/EMT

KENNETH S. TUCKER,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 11).  Petitioner filed a reply (doc. 17).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 11).[1]  Petitioner was indicted in the Circuit Court in and for Bay County, Florida, Case No. 2005-CF-1120, on one count of first degree murder for the murder of his wife,

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 11).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Lennia Hing Collier (Ex. C at 186). Following a bench trial on May 1–2, 2007, Petitioner was found guilty as charged (Ex. C at 268, Ex. D). The court adjudicated him guilty and sentenced him to life imprisonment without the possibility of parole, with pre-sentence jail credit of 763 days (Ex. C at 269–76, Ex. D at 483, 491).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D07-2600 (Ex. E). The First DCA affirmed the judgment per curiam without written opinion on January 9, 2009, with the mandate issuing January 27, 2009 (Exs. G, H). Collier v. State, 999 So. 2d 646 (Fla. 1st DCA 2009) (Table). Petitioner did not seek further review.

On March 3, 2010, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. I). He subsequently filed an amended motion (Ex. K). The state circuit court summarily denied the motion in an order rendered March 25, 2010 (Ex. L).

On March 19, 2010, Petitioner filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. N at 10–60). He subsequently filed an amended motion (*id.* at 63–112). The state circuit court summarily denied the motion (*id.* at 171–73, 278–82). Petitioner appealed the decision to the First DCA, Case No. 1D10-4107. The First DCA affirmed the judgment per curiam without written opinion on February 23, 2011, with the mandate issuing April 29, 2011 (Exs. O, S). Collier v. State, 58 So. 3d 263 (Fla. 1st DCA 2011) (Table).

On January 26, 2011, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D11-592, alleging ineffective assistance of appellate counsel (Ex. U). He subsequently filed an amended petition (Ex. V). The First DCA denied the petition on May 12, 2011, and denied Petitioner's motion for rehearing on June 2, 2011 (Exs. W, Y). Collier v. State, 65 So. 3d 41 (Fla. 1st DCA 2011) (Mem).

On January 25, 2011, Petitioner filed a second Rule 3.850 motion (Ex. AA at 1–25). He subsequently filed an amended motion and a second amended motion (*id.* at 161–34). The state circuit court summarily denied the motion (*id.* at 312–18). Petitioner appealed the decision to the First DCA, Case No. 1D11-4137 (Ex. DD). The First DCA affirmed the judgment per curiam

without written opinion on February 13, 2012, with the mandate issuing April 13, 2012 (Exs. EE, FF). Collier v. State, 83 So. 3d 713 (Fla. 1st DCA 2012) (Table).

Petitioner filed the instant federal habeas action on April 2, 2012 (doc. 1).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19. In relevant part, section 2254(d) now provides:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court

_____

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. See Gill, supra at 1291 (citing Harrington, 131 S. Ct. at 786). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. See Harrington, 131 S. Ct. at 786; see also Gill, supra, at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's

rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows

that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

## III. PETITIONER'S CLAIMS

<u>Ground Two[3]</u>:  "Petitioner was denied his right to effective assistance of counsel as guaranteed him under the 6th and 14th Amendments to the U.S. Constitution by counsel's failure to move to suppress Petitioner's confessions."

Petitioner contends defense counsel was ineffective for failing to seek suppression of his statements to law enforcement on two grounds:  (1) Sheriff Frank McKeithen re-initiated an interrogation after Petitioner had unequivocally invoked his right to counsel and without re-advising Petitioner of his <u>Miranda</u>[4] rights; and (2) Petitioner's statements were the product of coercion by law enforcement, because they knew he was mentally ill and legally incompetent at the time they interrogated him (doc. 1 at 4–5).[5]  Petitioner argues his statements to law enforcement were the only direct evidence against him (*id.*).  He argues if counsel had moved to suppress the statements, there is a reasonable probability he would have been acquitted (*id.*).

Respondent contends Petitioner's claim is without merit (doc. 11 at 7–13).

### 1.      Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir.

---

[3] The undersigned will address Ground One last, as Respondent did in his answer and Petitioner did in his reply.

[4] <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

Case No.: 5:12cv82/MMP/EMT

2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Chandler</u>, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Strickland</u>, 466 U.S. at 690); <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high. *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. <u>Strickland</u>, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal.  *See* <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694–95).

When a petitioner claims his counsel was ineffective for failing to file a timely motion to suppress, the petitioner must prove to following:  "(1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth [or Fifth] Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence."  <u>Zakrzewski v. McDonough</u>, 455 F.3d 1254, 1260 (11th Cir. 2006) (citing <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 375, 106 S. Ct. 2574, 2582–83, 91 L. Ed. 2d 305 (1986)).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).


2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground 1 in his first Rule 3.850 motion (Ex. N at 85–91).  The court adjudicated the claim as follows:

In Ground One, the Defendant claims that trial counsel was ineffective for failing to move to suppress his confession. The Defendant submits that the confession was obtained in violation of [*Miranda*], when the Defendant invoked his right to counsel and was later interrogated by police without an attorney present. The Defendant also states that his confession was involuntary due to his mental incompetence, and that the police were aware of his mental illness and coerced him into confessing. The Defendant asserts that he was prejudiced by his counsel's failure to move to suppress because the confession was the only direct evidence of his guilt and the element of premeditation.

The Defendant executed a *Miranda* waiver prior to speaking with the police. (*See* Trial Tr. at 188–89.) The Defendant did not initially confess but became upset and invoked his right to an attorney, effectively ending the police interrogation. (*See* Trial Tr. at 194.) Afterward, the Defendant requested to speak to Sheriff McKeithen on his own initiative. (*See* Trial Tr. at 195–96, 221–22, 235.) Following a lengthy confession at the Sheriff's office (*see* Trial Tr. at 222–256), the Defendant also agreed to be videotaped at the scene of the crime and explained his actions in detail. (*See* Trial Tr. 202, 204–215.)

Based on the foregoing, Defendant cannot show deficient performance by counsel, as a motion to suppress would not have been granted. *See Zakrzewski v. State*, 866 So. 2d 688, 694 (Fla. 2003) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious.") (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1968)). Since the record reflects that the Defendant understood his rights and freely and voluntarily waived them by initiating contact with Sheriff McKeithen, trial counsel would have no grounds for a motion to suppress. *See Fitzpatrick v. State*, 900 So. 2d 495 (Fla. 2005) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378, 386 (1981)); *see also Corner v. State*, 917 So. 2d 975, 979–80 (Fla. 3d DCA 2005).

Furthermore, a defendant does not have a constitutional right to confess to a crime only when completely rational or properly motivated; although statements from a mentally unstable defendant may be unreliable, their admissibility is governed by the rules of evidence not Due Process. *See Colorado v. Connelly*, 459 U.S. 157, 166–67, 107 S. Ct. 515, 521–22, 93 L. Ed. 2d 473 (1986); *see also Miller v. Dugger*, 838 F.2d 1530 (11th Cir. 1988) (holding that the interrogator's knowledge that the defendant was mentally disturbed does not render the confession involuntary unless the police used coercive tactics to exploit such a weakness); *State v. Crosby*, 599 So. 2d 138 (Fla. 5th DCA 1992) (reversing the suppression of a confession because defendant's mental incapacity in itself was not enough to exclude the statement, absent police misconduct). In this case, the record does not show that the investigators or the Sheriff used any coercion to extract the confession by the

Defendant.  Also, the Defendant's allegation that he was on psychotropic drugs at the time of the confession is rebutted by the transcript. (Trial Tr. at 256.) Therefore, counsel cannot be found ineffective for failing to raise a meritless claim.  *See Owens v. State*, 986 So. 2d 534, 543 (Fla. 2008).

(Ex. N at 278–79).

The state circuit court did not cite <u>Strickland</u>; however, a state court need not cite to, nor even be aware of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002).  The First DCA affirmed the lower court's decision without written opinion (Ex. O).  As previously discussed, when faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* <u>Gill</u>,  633 F.3d at 1287 (citing <u>Harrington</u>, 131 S. Ct. at 786).  The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* <u>Harrington</u>, 131 S. Ct. at 786; *see also* <u>Gill</u>, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

In <u>Miranda v. Arizona</u>, the Supreme Court held:

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.  Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until

such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

384 U.S. at 478–79.

In Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), the Supreme Court held that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his Miranda rights. 451 U.S. at 484. The Court further held that an accused who has expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. Id. at 484–85.

But even if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, where re-interrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation. Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S. Ct. 2830, 77 L. Ed. 2d 45 (1983). The inquiry into whether a defendant's waiver of effectuation of the rights conveyed in the Miranda warnings is made voluntarily, knowingly, and intelligently has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) (citations omitted).

The record supports the trial court's findings of fact. Investigator Steve Nagy testified at Petitioner's trial that prior to interviewing Petitioner on March 30, 2005, he read Petitioner a "Miranda Rights form" (Ex. D at 184, 187–88). Investigator Nagy testified Petitioner was able to communicate with him and appeared to clearly understand what was occurring (id. at 188). Nagy testified Petitioner indicated he understood the information that Nagy read to him from the form, and

Petitioner signed the waiver form prior to the interview (*id.* at 188–89.)  Investigator Nagy testified there were no promises or threats made to Petitioner in relation to signing the waiver (*id.* at 189). He testified he confirmed with Petitioner that Petitioner understood his rights, and Petitioner "had no problem talking to us" (*id.*).  The <u>Miranda</u> Rights form was admitted into evidence (*id.*). Investigator Nagy testified he and Captain Stanford interviewed Petitioner at 4:50 p.m. and continued for forty-five (45) minutes to one hour, during which time they asked him where he had been the day of the murder, and Petitioner "put himself all over the map" (*id.* at 189–92).  He testified Petitioner gave inconsistent answers regarding his whereabouts and his wife's whereabouts (*id.*).  Nagy testified Petitioner's answers were evasive, and Petitioner denied having anything to do with his wife's murder (*id.* at 190–92).  Investigator Nagy testified Petitioner's answers were responsive to his questions, though they might not have been truthful (*id.* at 192).  He testified he and Captain Stanford left the interview room, and Sheriff McKeithen requested an opportunity to interview Petitioner (*id.* at 193).  Investigator Nagy testified Petitioner did not provide any helpful information to Sheriff McKeithen, so he (Nagy) re-entered the room, showed Petitioner a picture of the victim, told Petitioner they knew he killed her, and asked Petitioner why he killed her (*id.* at 194).  Nagy testified Petitioner became very angry and stated he would not speak to him anymore without a lawyer (*id.*).  Nagy testified he left the room (*id.*).  He testified a few hours elapsed, and Petitioner told another investigator, who was guarding the door of the interview room, that he wished to speak to the Sheriff again (*id.* at 195).  Nagy testified the Sheriff returned to the interview room, and Nagy audio recorded the conversation between Petitioner and the Sheriff from an adjacent "tactical room" used by officers to observe the interview room (*id.* at 196–97).

Next, Sheriff McKeithen testified when he first entered the interview room (after Investigator Nagy and Captain Stanford first stepped out), he introduced himself to Petitioner and asked if he would talk to him (Ex. D at 221).  The Sheriff testified Petitioner said yes (*id.*).  The Sheriff then asked some questions, and Petitioner said he had already told the other investigators he didn't know anything (*id.*).  Sheriff McKeithen told Petitioner that if he (Petitioner) later decided he wished to talk to him, Petitioner could let him know (*id.*).  The Sheriff testified he went to the crime scene and was notified by a deputy at 8:30 p.m. that Petitioner wished to speak with him (*id.*).  The Sheriff testified he walked in the interview room and asked Petitioner how he was doing (*id.* at 222).  The

Sheriff testified Petitioner looked at him and said, "I did it, I killed her, she told me to do it" (*id.*). The audio recording of the conversation that followed was admitted into evidence (*id.* at 199).

After Petitioner confessed to Sheriff McKeithen, the Sheriff asked him if he would be willing to provide a recorded statement of what he just told him (Ex. D at 231). Petitioner agreed, and at approximately 9:14 p.m., Sheriff McKeithen asked Investigator Nagy to return to the room (*id.* at 231, 233). The Sheriff asked Petitioner to repeat what he had told him, and Petitioner agreed (*id.* at 231, 233–34). At the beginning of the recorded statement, Investigator Nagy asked Petitioner to confirm his willingness to provide a statement:

> Q [by Investigator Nagy]: Blake, just before we start to speak about this, earlier in the evening we, we had you brought up to the sheriff's office, is that correct?
>
> A: Yeah, that's right.
>
> Q: . . . And . . . when you were brought here you were read your rights, right?
>
> A: Right, you read me my rights.
>
> Q: Yeah, and . . . we've talked about an incident regarding your wife.
>
> A: Right.
>
> Q: And her murder.
>
> A: And her murder.
>
> Q: Okay, and . . . we've talked about that.
>
> [Sheriff McKeithen]: Steve, let me intervene one second. All right. We stopped talk[ing] to you about an hour ago, is that correct?
>
> A: Right, yeah, yeah, I stopped.
>
> Q: And then did you tell the investigator you wanted to see me and talk to me?
>
> A: Yes, sir.

Q: And that was at your own request?

A: Yes, at my request, that I would speak to you.

(Ex. D at 234–35). At the end of the interview, Petitioner stated he was "totally sober" and made the statement of his own free will (*id.* at 256). He stated, "I did tell you on my own initiative [so] that I wouldn't have to hide, that I would not have to hide my sin at all" (*id.*). After the confession, Petitioner also agreed to be videotaped at the scene of the crime, where he again explained his actions in detail (*id.* at 202, 204–215).

Petitioner contends the state court's rejection of his claim was unreasonable, because the court's finding that Petitioner re-initiated contact with Sheriff McKeithen was based upon inadmissible hearsay (doc. 17 at 1–3). However, Petitioner's admission to Sheriff McKeithen and Investigator Nagy that he told an investigator he wished to re-initiate contact with Sheriff McKeithen fell under the admissions exception to Florida's hearsay rule, *see* Fla. Stat. § 90.803(18)(a), (b), and thus would have been admissible during a hearing on a motion to suppress Petitioner's confession. *See* <u>Parker v. State</u>, 89 So. 3d 844, 859 (Fla. 2011) ("the language of the [Florida] evidence code regarding hearsay encompasses hearings as well as trials"). Therefore, defense counsel had no meritorious basis to seek suppression of the confession on that ground (and the state court properly considered Petitioner's admission in adjudicating Ground 1 in Petitioner's first Rule 3.850 motion).

Petitioner additionally contends the state court's determination that his re-initiation of contact with law enforcement was sufficient to permit further interrogation was unreasonable, because there was no indication he waived his right to counsel after he re-initiated contact (doc. 17 at 2). To the extent Petitioner contends Sheriff McKeithen was required to re-advise him of his <u>Miranda</u> rights after Petitioner re-initiated contact, his claim is without merit. The Eleventh Circuit has held that where a defendant was fully advised of his <u>Miranda</u> rights and waived them, he does not need to be given <u>Miranda</u> warnings prior to a subsequent interrogation conducted the same day if, given the totality of the circumstances, the waiver was knowing, intelligent, and voluntary. *See* <u>Ballard v. Johnson</u>, 821 F.2d 568, 571–72 (11th Cir. 1987) (where defendant properly executed waiver of <u>Miranda</u> rights during first interrogation, and subsequent interrogation occurred later on

the same day, with the only break in questioning occurring when defendant was transported approximately twenty miles from one location to another, no violation of <u>Miranda</u> occurred by officer's failure to re-advise defendant of <u>Miranda</u> rights prior to subsequent interrogation); <u>Jarrell v. Balkcom</u>, 735 F.2d 1242, 1254 (11th Cir. 1984) (no violation of defendant's rights by failure to re-issue <u>Miranda</u> warnings at time of defendant's arrest, where Investigator Bishop gave defendant <u>Miranda</u> warnings at city hall prior to arrest; defendant indicated he understood <u>Miranda</u> warnings; defendant was transported from city hall to police headquarters, where he was interviewed by Sergeant Blannott; prior to Blannott's interview, Blannott asked Bishop in defendant's presence whether defendant had received <u>Miranda</u> warnings; defendant was driven from police headquarters to prosecutor's office for polygraph examination; defendant was then driven back to police headquarters and arrested by Sergeant Blannott; and defendant was interrogated for 30–45 minutes by Blannott before confessing); *see also* <u>Martin v. Wainwright</u>, 770 F.2d 918, 930–31 (11th Cir. 1985), *modified in unrelated part*, 781 F.2d 185 (11th Cir. 1986) (suspect who was fully advised of <u>Miranda</u> rights and intelligently waived them, did not need to be given the complete <u>Miranda</u> warnings prior to a subsequent interrogation conducted seven days later).

In the instant case, the record demonstrates Investigator Nagy advised Petitioner of his <u>Miranda</u> rights on March 30, 2005, at 4:50 p.m., and Petitioner executed a written waiver of those rights. The record further demonstrates that Sheriff McKeithen's subsequent interview was conducted approximately four (4) hours later the same day, after Petitioner re-initiated contact. Additionally, after Petitioner re-initiated contact with Sheriff McKeithen, he reaffirmed he had previously been advised of his <u>Miranda</u> rights and invoked his right to counsel, but then re-initiated contact with law enforcement. In such circumstances, defense counsel would not have a meritorious basis for seeking suppression of Petitioner's confession on the ground that Sheriff McKeithen failed to re-advise him of his <u>Miranda</u> rights.

Finally, Petitioner contends the state court unreasonably determined defense counsel had no meritorious basis to argue Petitioner's confession was unknowing and involuntary due to his mental illness and mental incompetence at the time of the waiver (doc. 17 at 2–3). Petitioner states three doctors declared him mentally incompetent to proceed, based upon evaluations they performed shortly after his arrest (*see* doc. 1 at 13).

The law requires more than mere mental illness to render a confession involuntary. In Colorado v. Connelly, 479 U.S. 157, 161–70, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), the Supreme Court upheld the murder conviction of a defendant suffering from schizophrenia who confessed to a police officer after the "voice of God" instructed him either to confess to the murder or to commit suicide. The Court held the confession voluntary because the compulsion to confess was not accompanied by "coercive police activity." 479 U.S. at 164–67; *see also* United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995). In the instant case, in Petitioner's Rule 3.850 motion, he alleged no facts suggesting he was forced to speak or mistreated in any way by law enforcement, nor did he allege facts suggesting law enforcement took advantage of his state of mind in questioning him (*see* Ex. N at 70–72, 86–91). Further, the record does not reveal any evidence of police coercion. "In the context of the voluntariness of a confession, a defendant's mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional voluntariness." United States v. Palmer, 203 F.3d 55, 61–62 (1st Cir. 2000). While mental impairment "is a factor to be considered by the trial court when ruling on the validity of a waiver," even a suspect's mental retardation does not preclude a finding that he voluntarily and intelligently waived his privilege against self-incrimination. Dunkins v. Thigpen, 854 F.2d 394, 399 (11th Cir. 1988) (19–year–old functionally illiterate and moderately retarded suspect understood his Miranda rights and knowingly waived them); Devier v. Zant, 3 F.3d 1445, 1460 n.46 (11th Cir. 1993) (suspect's waiver was knowing and intelligent despite low mental functioning where "nothing in the record . . . suggest[ed] that he was so impaired as to not understand the meaning of the Miranda warnings"); Atkins v. Singletary, 965 F.2d 952, 962 (11th Cir. 1992) (neither suspect's mental impairment nor his alcohol and drug consumption prevented him from making a voluntary and knowing waiver of his Miranda rights); United States v. Gaddy, 894 F.2d 1307, 1312 (11th Cir. 1990) (suspect with dependent personality disorder and who had a history of emotional problems and addiction to prescribed medications made a valid waiver of his Miranda rights); *see also* United States v. Burson, 531 F.3d 1254, 1257–59 (10th Cir. 2008) (defendant's prior methamphetamine use and tiredness did not preclude a knowing and intelligent waiver of his Miranda rights); United States v. Cristobal, 293 F.3d 134, 138–43 (4th Cir. 2002) (suspect interviewed the day after he suffered multiple gunshot wounds, and while he was taking pain killers and narcotics, was nevertheless capable of making a

knowing and intelligent waiver of his Miranda rights). As the Tenth Circuit has put it, "a defendant must be impaired to a substantial degree to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination." Burson, 531 F.3d at 1258. Thus, it is not sufficient for a defendant merely to show that he was mentally ill; rather, he must establish that his mental state had the actual effect of rendering his Miranda waiver unknowing or unintelligent. Nor is it sufficient for a defendant challenging a Miranda waiver to show that his mental state could have impaired him to the point that his confession cannot be considered a product of a free mind and rational intellect. Instead, the record must establish that, due to a mental disorder, the defendant was in fact unable to comprehend and effectively waive his rights.

In the instant case, there is record evidence that Petitioner was mentally ill at the time he gave his confession on March 30, 2005. In September and October of 2006, Dr. Michael D'Errico evaluated Petitioner's sanity at the time of the offense, March 21, 2005, and determined he was suffering from paranoid schizophrenia (Ex. AA at 137). In evaluating Petitioner's sanity, Dr. D'Errico reviewed a transcript of Petitioner's confession, a transcript of a witness who observed Petitioner in the days preceding the offense, drug test results, summaries of depositions, and records of Petitioner's prior and current psychiatric treatment (*id.* at 135). Dr. D'Errico also interviewed Petitioner regarding details associated with his perceptions and behaviors at the time of the offense (*id.*). Dr. D'Errico opined that Petitioner's behaviors during the time period of the offense "were likely directly related to his erroneously delusional belief in 'the prophesy,'" which Petitioner interpreted from the book of Revelations in the Bible and through "'hearing other peoples' minds talking to me.'" (*id.* at 137). Petitioner told Dr. D'Errico that his wife also believed in "the prophesy" and was willing to become involved in "fulfilling the prophesy." (*id.*). Petitioner told Dr. D'Errico that the idea of the prophesy was one in which he would have to kill his wife, cut off her head, and also cut out her heart (*id.*). Petitioner stated that the prophesy continued that if he buried his wife's body in sand and placed her head and her heart in a black bag and dropped it in the middle of the sea, he would "gain ultimate power and become the great ruler of the world then, according to the omens." (*id.*). Petitioner continued that he and his wife understood the prophesy to include the fact that "my wife's brain would be cooled down by the sea and the omen will free her into the air and I will breath[e] her in through the air in seven days." (*id.*). Dr. D'Errico concluded that at

the time of the offense, Petitioner suffered from a psychotically distorted interpretation of verses from the Book of Revelations compounded by other information he understood through his experiences of auditory hallucinations, and there was "much data to support an adjudication of insanity" (*id.* at 138).

Dr. D'Errico also determined Petitioner was suffering from paranoid schizophrenia when he evaluated Petitioner for competency on April 4, April 6, and April 8 of 2005, days after Petitioner's confession (Ex. AA at 106–11). When Dr. D'Errico interviewed Petitioner in April of 2005, he noted, "Due to obvious problems with illogical and tangential thought patterns, the understandability of his communication ranged between coherency and incoherency." (*id.* at 108). During the interviews, Petitioner admitted experiencing auditory hallucinations (*id.*). Dr. D'Errico noted Petitioner made "illogical and delusional-sounding statements" (*id.*). He also noted Petitioner had difficulty providing accurate definitions of the roles of the state attorney, judge, jury, and witnesses; for example, he described the function of the jury as to "see the kind of person that I am" and the function of the judge as "what's best for the trial and the thirteen jurors." (*id.* at 109). Based upon these statements, Dr. D'Errico opined Petitioner had an "unacceptable" understanding of his legal predicament and of the adversarial nature of the legal process (*id.*). He further opined Petitioner lacked sufficient ability to effectively assist his defense attorney either inside or outside of the courtroom (*id.*). He noted, "For reasons of disorganized and illogical thought processes, he was currently considered to be unable to testify meaningfully and relevantly in his own behalf should he be called upon to do so." (*id.* at 109–10). Dr. D'Errico concluded Petitioner was incompetent to proceed (*id.*).

Petitioner was also evaluated for competency by Dr. Clinton Rhyne. Dr. Rhyne evaluated Petitioner on April 10–17, 2005, within two to three weeks of his confession (Ex. AA at 112–18). He preliminarily diagnosed Petitioner as suffering from Antisocial Personality Disorder (*id.* at 116). Dr. Rhyne noted Petitioner was fully aware of the charges he was facing and the possible penalty of death, and Petitioner was able to understand the duties and functions of various officers of the court and the adversarial system (*id.* at 115–16). Dr. Rhyne opined that Petitioner's present ability to effectively interact with his attorney and to assist in his own defense was compromised by the presence of an atypical mood disturbance and likely psychotic thinking (*id.* at 116). He further

opined Petitioner's present ability to testify relevantly and to effectively challenge witnesses against him were likewise compromised (*id.*). Dr. Rhyne opined Petitioner did not have the present ability to maintain appropriate courtroom demeanor, and his ability to withstand prolonged incarceration waiting trial was questionable (*id.*). In that regard, Dr. Rhyne noted that Petitioner inflicted a wound to his groin and engaged in a serious attack on another inmate (*id.*). Dr. Rhyne opined that Petitioner was not presently competent to proceed (*id.*).

As discussed *supra*, Investigator Nagy testified at trial that Petitioner (1) indicated he understood he was there to be interrogated, (2) indicated he understood the explanation of his Miranda rights as provided by Investigator Nagy, (3) provided answers that were responsive to questions, (4) was initially evasive and nonchalant but then became appropriately angry when investigators attempted to evoke emotion by showing him a picture of his wife and accusing him of killing her, (5) terminated the interrogation in response to the investigators' accusations, (6) after a few hours passed re-initiated contact with Sheriff McKeithen, (7) acknowledged he had previously been advised of his rights, (8) acknowledged he had requested to speak with law enforcement even though he had previously terminated the interview, and (9) acknowledged his confession was of his own free will.

During Petitioner's confession, as evidenced by the transcript, he told Sheriff McKeithen that the victim wanted him to kill her, because it fulfilled "the prophesy," which he described in detail (Ex. D at 222–56). Petitioner's answers to prophesy-related questions, for example, questions relating to why he killed his wife and the meaning of his actions, were incoherent. However, his description of how he killed her was coherent and clear. Most importantly, his answers to questions relating to his understanding of the purpose of the interrogation, his legal rights with regard to speaking with investigators and the Sheriff, the significance of his stopping the interrogation and then re-initiating it, the truthfulness of his confession, and his absolute willingness to provide it, were coherent and rational, and indicated he was in fact able to comprehend and effectively waive his rights.

As previously discussed, under the "unreasonable application" prong of § 2254(d), this federal court must defer to the state court's adjudication of Petitioner's claim so long as fairminded jurists could disagree that the decision is inconsistent with Strickland. In this case, fairminded

jurists could disagree that defense counsel had no meritorious basis to seek suppression of the confession on the ground that Petitioner's mental state impaired him to the point that his confession could not be considered a product of a free mind and rational intellect. Therefore, he has not satisfied the standard for federal habeas relief.

> B. Ground Three: "Petitioner was denied his right to effective assistance of counsel as guaranteed him under the 6th and 14th Amendments to the U.S. Constitution by counsel allowing his mentally incompetent client to proceed to trial following a procedurally deficient competency hearing."

Petitioner asserts his competency to stand trial was in question in early 2007, when doctors' reports indicated his mental state was deteriorating (doc. 1 at 5). He asserts the court ordered a competency evaluation by one doctor, however, the court failed to comply with Rule 3.210 of the Florida Rules of Criminal Procedure by failing to appoint two doctors and failing to hold a hearing (*id.*). Petitioner contends defense counsel was ineffective for failing to object to these two deficiencies and permitting him to proceed to trial (*id.*).

Respondent contends Petitioner demonstrated neither deficient performance nor prejudice (doc. 11 at 13–16). As to his claim that counsel was ineffective for allowing him to proceed to trial when he was incompetent, Respondent contends Petitioner's claim fails on both Strickland prongs, because counsel did inform the trial court that Petitioner's competency had deteriorated, but Dr. D'Errico had determined that Petitioner was still competent to proceed to trial (*id.*). Thus, counsel cannot be ineffective for failing to object to Petitioner proceeding to trial as incompetent, since he was, actually, competent (*id.*). As to Petitioner's claim that counsel was ineffective for failing to object to the court's alleged failure to hold a competency hearing, Respondent argues Petitioner cannot demonstrate either deficient performance or prejudice, because Petitioner was evaluated by three doctors who determined he was incompetent, but other doctors subsequently reported Petitioner was restored to competency (*id.*). Accordingly, Respondent contends Petitioner failed to demonstrate how his counsel was deficient in failing to object to a lack of compliance with Florida rules (*id.*).

> 1. Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

> 2. Federal Review of State Court Decision

Petitioner raised this claim as Ground 2 in his first Rule 3.850 motion (Ex. N at 91–94). The state circuit court adjudicated the claim as follows:

> The record shows that the Defendant was examined by three doctors and later adjudged incompetent to proceed on August 3, 2005. (*See* Notice of Filing; *see also* Order Adjudging Defendant Incompetent to Proceed.) After treatment and continued observance by doctors at the North Florida Evaluation and Treatment Center in Gainesville, the Defendant was found competent to proceed to trial at a hearing held on August 31, 2006. (*See* Transcripts from Competency Hearing; *see also* Minute Sheet.) No further competency evaluations were ever ordered through the conclusion of the proceedings. However, on November 6, 2006, the Defendant filed a notice of intent to rely on an insanity defense, which triggered this Court ordered [*sic*] a sanity evaluation. (*See* Notice of Intent; *see also* Order Appointing Expert for Sanity Evaluation.) Although the court order only appointed Dr. McClaren to evaluate the Defendant, both Dr. McClaren and Dr. Michael D'Errico examined the Defendant for sanity at the time of the offense. (*See* Trial Transcripts at 408, 434–435.)
>
> The Defendant appears to be confusing competency with sanity. The only order on record after the Defendant was adjudged competent to proceed is the order appointing an expert for a *sanity* evaluation, not a *competency* evaluation. Although the court docket entry on November 20, 2006 shows a scheduled competency hearing to be held on January 4, 2007, the Court's order that scheduled the sanity hearing for January 4, 2007 was entered on the same day. (*See* Docket; *see also* Order Appointing Expert for Sanity Evaluation.) Evidently, the clerk made a clerical error in the docket entry and should have noted the scheduling of a sanity hearing not a competency hearing. Several amended orders appointing an expert for a sanity evaluation were also entered in December 2006, but never an order for a competency evaluation. (*See* Amended Order and 2d Amended Order.)
>
> The State acknowledges in its response that the Defendant's mental health was brought into question in early 2007 when the Defendant's antipsychotic medicine had apparently been changed by doctors. However, the trial court believed him to be competent and was in contact with the Defendant's doctors. (*See* Case Management Conference Transcripts from 1/29/07 at 7–12.) At a pretrial conference on April 3, 2007, trial counsel informed the Court that "[the Defendant's] mental condition has deteriorated somewhat in the last few months, but according to Dr. D'Errico he is still competent to go to trial . . ." (*See* Pretrial Conference Transcripts from 4/3/07 at 3.) As the initial competency evaluation complied with the rules, and no further competency evaluations were ordered or even deemed necessary, trial counsel was not ineffective for allowing the Defendant to stand trial while incompetent or for failing [to] object to a procedurally deficient competency determination.

(Ex. N at 171–72). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. O).

The Due Process Clause of the Fourteenth Amendment prohibits states from trying or convicting a defendant who is mentally incompetent. *See* <u>Pate v. Robinson</u>, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). The Supreme Court set the standard to be used in determining mental competency as whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." <u>Dusky v. United States</u>, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed 2d 824 (1960) (per curiam); <u>Drope v. Missouri</u>, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *see also* <u>Indiana v. Edwards</u>, 554 U.S. 164, 128 S.Ct. 2379, 171 L. Ed. 2d 345 (2008).

In <u>Drope</u>, the Court elaborated as follows:

[t]he import of our decision in <u>Pate v. Robinson</u> is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

<u>Drope</u>, 420 U.S. at 180.

The Eleventh Circuit Court of Appeals has applied and expounded upon these standards. "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." <u>Medina v. Singletary</u>, 59 F.3d 1095, 1107 (11th Cir. 1995) (citation omitted). A <u>Pate</u> analysis must focus on "what the trial court did in light of what it then knew, [and] whether objective facts known to the trial court were sufficient to raise a bona fide doubt as to the defendant's competency." <u>Fallada v. Dugger</u>, 819 F.2d 1564, 1568 (11th Cir. 1987) (citations omitted). A petitioner who makes a substantive competency claim, contending that he was tried and convicted while mentally incompetent, "is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence."

James v. Singletary, 957 F.2d 1562, 1571 (11th Cir. 1992). This standard is in contrast to a petitioner who makes a procedural competency claim alleging that the trial court failed to hold a competency hearing after his competency was put at issue. To prevail on a procedural competency claim, "a petitioner must establish that the state trial judge ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial." *Id.* at 1572 n.15 (citing Fallada, 819 F.2d at 1568). A petitioner who presents "clear and convincing evidence" which creates a "real, substantial and legitimate doubt" as to his competence is entitled to an evidentiary hearing on his substantive competency claim. Medina, 59 F.3d at 1106 (quoting James, 957 F.2d at 1573). However, the standard of proof is high, and "the facts must positively, unequivocally, and clearly generate the legitimate doubt." Card v. Singletary, 981 F.2d 481, 484 (11th Cir. 1992) (quotations omitted). Relevant information may include evidence of a defendant's irrational behavior, demeanor at trial, or prior medical opinion. *See* Watts v. Singletary, 87 F.3d 1282, 1287 (11th Cir. 1996).

A lifelong history of mental illness and emotional problems does not demonstrate incompetency without a specific showing of how these difficulties generated a substantial doubt as to the defendant's competency at the time in question. *See* Medina, 59 F.3d at 1106; Card, 981 F.2d at 484. Similarly, the fact that the accused is undergoing treatment with psychiatric drugs, while relevant, does not alone prove incompetence. *See* Sheley v. Singletary, 955 F.2d 1434, 1438–39 (11th Cir. 1992). In order to establish incompetence, evidence must establish that the drugs affected the accused to the point that he could not effectively consult with his attorney and could not understand the proceedings. *See id.* at 1439.

In the instant case, the record demonstrates that on May 12, 2005, the prosecutor filed a motion to appoint experts for a competency and sanity evaluation (Ex. C at 191). The trial court granted the motion and set a competency hearing for August 2, 2005 (*id.* at 192–97). Prior to the hearing, the prosecutor filed evaluations from Harry McClaren, Ph.D., Michael T. D'Errico, Ph.D., and Clinton E. Rhyne, Ph.D. (*see id.* at 198). A hearing was held on August 2, 2005, at the conclusion of which the court determined Petitioner was incompetent to proceed due to mental illness (*id.* at 200–03). Approximately one year later, on August 16, 2006, defense counsel notified the court that the mental hospital at which Petitioner had been confined reported that Petitioner was competent (*id.* at 204). The court held a hearing on August 31, 2006, and adopted the

recommendation of the doctors and found that Petitioner was competent to proceed (*id.* at 205–06, 209, 309–14).

On November 14, 2006, defense counsel filed a motion to appoint an expert for an evaluation of Petitioner's <u>sanity at the time of the offense</u> (Ex. C at 213). The trial court granted the motion and appointed Dr. Harry McClaren to perform the evaluation (*id.* at 218–20). The court also set a hearing for January 29, 2007 (*id.*). Although the court appointed only Dr. McClaren, the trial transcript demonstrates that Michael D'Errico also evaluated Petitioner for sanity at the time of the offense (*see* Ex. D at 397–409)

A case management conference was held on January 29, 2007 (Ex. N at 236–51). At the conference, the court inquired of defense counsel whether there was any reason the case could not be tried on April 30, 2007 (*id.* at 242). Defense counsel responded that Petitioner's competency "is always kind of tenuous" (*id.*). Defense counsel and the prosecutor informed the court that Dr. McClaren was concerned about "some loosening" due to the institutional doctors changing one of Petitioner's medications because of physical side effects (*id.* at 242–43). Petitioner addressed the court regarding the side effects, and he later addressed the court on the issue of his preference for a bench trial (*id.* at 243–45, 248–50). Petitioner did not exhibit any signs of irrationality or unusual demeanor. At a pretrial conference on April 3, 2007, defense counsel informed the trial court that "[Petitioner's] mental condition has deteriorated somewhat in the last few months," due to doctors' "tinkering" with his medications, but counsel advised that according to Dr. D'Errico, Petitioner was still competent to go to trial (*id.* at 252–57).

Although the trial court was advised that Petitioner's mental state had deteriorated somewhat in the three to four months prior to trial, the court was also advised that one of the doctors who performed the competency evaluation and the sanity evaluation determined that Petitioner was still competent to proceed. Further, during the pre-trial proceedings after the trial court's competency finding on August 30, 2006, there were no indications Petitioner did not have a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, or that he did not have a rational and factual understanding of the proceedings. Indeed, in a report issued March 15, 2007, just six (6) weeks prior to Petitioner's trial, Dr. D'Errico determined that Petitioner continued to display an adequate understanding of the nature and object of the proceedings against

him, and although his ability to assist defense counsel and "perform in the role of defendant" had deteriorated somewhat, he still appeared to have "at least marginally acceptable" abilities in these areas (Ex. AA at 139–43).  Dr. D'Errico concluded that Petitioner was "generally competent to proceed to trial" (*id.*).  Moreover, Petitioner offered nothing, beyond his own speculation, showing that he would have been determined incompetent had counsel objected to Petitioner's proceeding to trial without the appointment of two experts and a competency hearing.  Indeed, Dr. D'Errico's finding of competency on March 15 2007, refutes Petitioner's allegation that the result of the proceedings would have been different if counsel had objected to the trial court's alleged failure to comply with Rule 3.120.

Based upon this record, Petitioner failed to demonstrate defense counsel was ineffective for failing to object to the trial court's failure to hold a competency hearing or otherwise comply with the procedural requirements of Rule 3.120 <u>after</u> the determination of competency on August 30, 2006.  *See* <u>Brownlee v. Haley</u>, 306 F.3d 1043, 1066 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit); <u>Chandler v. Moore</u>, 240 F.3d 907, 917–18 (11th Cir. 2001) (rejecting argument for ineffective assistance of counsel where counsel failed to raise a non-meritorious claim); <u>Meeks v. Moore</u>, 216 F.3d 951, 961 (11th Cir. 2000) (counsel not ineffective for failing to make meritless motion for change of venue); <u>Jackson v. Herring</u>, 42 F.3d 1350, 1359 (11th Cir. 1995) (counsel need not pursue constitutional claims which he reasonably believes to be of questionable merit); <u>United States v. Winfield</u>, 960 F.2d 970, 974 (11th Cir. 1992) (no ineffective assistance of counsel for failing to preserve or argue meritless issue); *see also* <u>United States v. Kimler</u>, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."). Therefore, Petitioner failed to demonstrate that the state court's adjudication of this claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of <u>Strickland</u>.

      C.      <u>Ground Four:  "Petitioner was denied his right to effective assistance of counsel as guaranteed him under the 6th and 14th Amendments to the U.S. Constitution by counsel coercing his mentally incompetent and heavily medicated client into waiving his constitutional right to a jury trial."</u>

Petitioner asserts "on the eve of trial," defense counsel badgered and coerced him into waiving his right to a jury trial (doc. 1 at 6). Petitioner states he never wanted a bench trial and always wanted a jury trial (*id.*). He states prior to trial, he had asked defense counsel to file a motion for change of venue (*id.*). He states counsel told him an impartial jury could be picked; however, on the eve of trial, counsel advised him that it would be impossible to obtain an impartial jury in Bay County and demanded that Petitioner waive his right to a jury trial (*id.*). Petitioner states he initially resisted counsel's effort to convince him to waive a jury trial, but counsel advised him he would "certainly" be convicted by a Bay County jury and would "certainly" be sentenced to death (*id.* at 7). Petitioner states his mental illness and heavy medication rendered him vulnerable to counsel's pressure (*id.*).

Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (doc. 11 at 16–21).

        1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

        2.      Federal Review of State Court Decision

Petitioner raised this claim in Grounds 3 and 4 of his first Rule 3.850 motion (Ex. N at 95–100). The state circuit court adjudicated the claims as follows:

> In Ground Three, the Defendant alleges that trial counsel was ineffective for coercing him into waiving his right to a jury trial. The transcripts from the pretrial hearing on April 27, 2007 conclusively rebut this argument. (*See* attached Pretrial Transcript at 6–13.) The trial court conducted an extensive . . . colloquy where it explained that the Defendant had an absolute right to a jury trial, and that if an impartial jury could not be selected, the Defendant would be entitled to have the matter tried in a different community. (*See* Pretrial Tr. at 6–7.) The Defendant confirmed that he had spoken with trial counsel regarding his jury trial waiver, and he was satisfied with his services. He acknowledged that he understood his rights and that no one had forced him to waive a jury trial or promised him any particular outcome. Furthermore, trial counsel and the Defendant both acknowledged on the record that the Defendant favored a bench trial over a jury trial. (*See* Pretrial Tr. at 2, 10.) ("[Y[ou got to take in more facts than I think it would be better than a plumber and clean house ladies. I mean, you've seen criminals, you were a lawyer . . . . [A] jury wouldn't understand my side of the story . . .") Also, the Defendant signed a Wavier of Jury Trial Form. (*See* Waiver of Jury Trial.) Therefore, the

Defendant's allegations are without merit. *See Schwab v. State*, 814 So. 2d 402 (Fla. 2002).

> In Ground Four, the Defendant argues that trial counsel was ineffective for failing to move to change venue, which prejudiced the Defendant by forcing him to waive his right to a jury trial. Again this claim is rebutted by the transcript. The Defendant acknowledged that he understood he could move to change venue if an impartial jury could not be selected. (*See* Pretrial Tr. at 6–7.) Nonetheless, he decided to waive this right and preferred that the judge decide the case. (Pretrial Tr. at 10.) His jury trial waiver, which was addressed above, was knowing and voluntary. Furthermore, the decision not to seek a change of venue is a strategic decision, and not usually the subject of attack. *See Rolling v. State*, 825 So. 2d 293, 298 (Fla. 2002). Therefore, the Defendant's claim is denied.

(Ex. N at 280). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. O).

The state record demonstrates that at a pre-trial hearing on April 27, 2007, the following occurred:

> THE COURT: We're here on State versus Collier, 05-1120. This matter is set for trial jury trial [sic] next week beginning on Monday. Do you have an announcement for the court?

> MR. SMITH: Judge, after consultation with Mr. Collier. He, and this has always been his position, he's always wanted to try the case in front of you instead of a jury. Dustin Stephenson [a prosecutor], who was handling the case prior to Mr. Graham's [another prosecutor] involvement was opposed to that. And I always assumed it was because higher-ups had told them, you know, you've got to go to a jury trial. So we didn't pursue it any further. Well, then when Mr. Graham got involved in the case we had some conversations about the merits of trying it without a jury and he indicated to me that it was acceptable to others in his office, as well as the victim's family, if we try this in front of the court. And so I had an opportunity to pursue that issue with Mr. Collier out at the annex yesterday and he indicated to me that, indeed, that is what he wanted to happen. So I met with him just a few minutes ago, explained to him what we were here about and had him execute a Waiver of Jury Trial just basically pursuant to Rule 3.260, which is the applicable Rule in the Rule of Criminal Procedure, he state's [sic] that he hereby waives his right to trial by jury and acknowledges that his guilt or innocence will be determined solely by Judge Overstreet. He indicated that was acceptable to him and he signed it just a few minutes ago. . . . .

> (Defendant Sworn)

Questions by the Court:

   Q.  Would you state your full name, please?

   A.  Blake Allen Chadwick Collier.

   Q.  Mr. Collier, we're here today in your case, you heard the announcement of your attorney a moment ago and I'm going to be asking you some questions about that. . . .

(After asking questions about Defendant taking his medication and not experiencing any hallucinations)

   Q.  You've had an opportunity today to, I guess to, and probably yesterday, as well, as I understand it, to discuss these various issues about waiver of a jury trial, whether it be in the fault stage or in the penalty phase of the trial if you were to be found guilty by a jury.  Have you had an opportunity to discuss all of that with Mr. Smith, is that correct?

   A.  Yes, sir.

   Q.  Did you speak with him yesterday as well as today?

   A.  Yes, sir, that's right.

. . . .

   Q.  Okay. Thank you.  Regarding the announcement he made a moment ago and the waiver that you signed related to your interest in waiving a jury trial, both in the guilt stage of this matter and also the penalty phase in the event you were found guilty, do you realize that you have a Constitutional right to have this matter decided by a jury?

   A.  Yes, sir.

   Q.  Do you realize that because this is a case in which the state is seeking the death penalty you have a right to a 12 member jury?

   A.  Yes, sir, I've studied that.

   Q.  Do you realize that if we were unable to select a 12 member jury next week because of their exposure to the publicity surrounding this case or their opposition to the imposition of the death penalty you would be entitled to have this matter tried in a different community that might be less likely to know anything about the case?

A.  Yes, sir.

Q.  Do you realize that it is the duty of the state to prove your guilt beyond a reasonable doubt, and in order to obtain a guilty verdict all 12 members of the jury would have to agree that you were guilty?

A.  Yes, sir.

Q.  Do you realize that if merely one of the members of the jury thought you were not guilty you would be entitled to a new trial?

A.  Excuse me, one more time, sir?

Q.  Do you realize that if merely one of the members of the jury thought that you were not guilty that you would be entitled to a mistrial and a new trial after that?

A.  Yeah, yes, sir, yes, sir.

Q.  Do you realize that even if the jury found you guilty as charged the state would have to prove all of their aggravating circumstances beyond a reasonable doubt and also convince a jury by a majority vote that the aggravating circumstances outweighed the mitigating circumstances?  Are you familiar with that?

A.  Could you break that one down a little bit?

Q.  Sure, I will.  You've talked to Mr. Smith about the potential penalty phase in front of a jury, is that correct?

A.  In front of a jury?  Oh, oh, how it would be in front of a jury, yes, sir.

Q.  And my question to you was do you realize that the state has the burden of proof in that part of the trial, as well?

A.  Right.

Q.  And that they have to prove certain aggravating circumstances to the jury, do you understand that?

A.  Yes.

Q.  And their responsibility is to prove those circumstances beyond a reasonable doubt, just like they have to prove your guilt.  Do you understand that?

A. Yes.

Q. So you have the same 12 members of a jury weighing this evidence with these burdens placed on the state to prove these aggravating circumstances. And I say that because we're discussing giving up your right to a jury trial again.

A. Right.

Q. Today. So you understand the penalty phase portion of a trial of this [n]ature, is that right?

A. Yes sir. If I might say something. People might think and not understand my case which is going to come out next week when we go to trial, all the facts, all the details. They might think it might be hard for me to sleep at night but after, after, once all the words get out and I have been shy, I know the newspapers and the news has been playing everything, I don't think it's Constitutionally right for even the, I mean, I know the law, I don't know the law like you do, I mean, as in law, as in pressing for the death penalty, wanting to kill somebody as in the prosecutors, I don't think that is right how they want to put a mentally ill person down as I speak for myself, as I would be defending myself just for a second. And I don't think that is right, you know. I don't even see why, but I know that the family wants to press for that and that they do have the right and that I was in the hospital and I can't take a pill and say all my mind is going to get better and everything is going to change and everything is, all the voices are going to go away, all the stress, and the, just everything is going to go away. I said I wanted to get back to trial so that I could face the music and so that I could face the family and state my side, which I've never been able to state so far. And, but I was saying earlier about them I just don't think it is right, but they have their job as prosecutors to do that and sleep well at night. So this is what I think.

Q. Well, you know, if you waive your jury, you're only going to have one person who had to decide whether he agrees with that philosophy or not. Do you understand that? And that's me.

A. Yes, sir, and you got to take in a lot more facts than I think it would be better than a plumber and clean house ladies. I mean, you've seen criminals, you were a lawyer, weren't you at one time before you were a judge?

Q. As best I can recall.

A. Right. And if, I'm just trusting God, I know I got into something that I shouldn't have and I lost my mind and—

Q.  Okay, I don't want you to tell me any more about the case—

A.  Okay, okay, I'm going to say, I'm not going to talk, but I made a mistake, okay, out of my worst judgment and I'm ready to just deal with it in front of you and not a bunch of people out of the community that could be very biased towards me and just want to fry me.  I felt like I couldn't do this, I couldn't come to court and do this because I felt like I was going to get railroaded straight into the, into like a prison or the shot or whatever because a jury wouldn't understand my side of the story and a judge has seen many different instances, it has to take in, take in, you know, both sides, see which way, weigh it out.  That's all I can say, but that's all I'm going to say about it.

Q.  Has anyone forced you to waive your rights to a jury trial in this matter?

A.  No, sir.

Q.  Do you feel like you've had adequate time to discuss the case and this decision today with Mr. Smith.

A.  Yes, sir.

Q.  Has anyone promised you any particular outcome if you waive your right to a jury trial?

A.  No, sir.

Q.  Are you satisfied with the services of Mr. Smith?

A.  Yes, sir.

(Ex. N at 373–382).  Additionally, at a case management conference three months prior, on January 29, 2007 (significantly prior to the "eve of trial"), Petitioner advised the court of his desire to waive a jury trial and have a bench trial (*id.* at 248–49).

The record refutes Petitioner's allegation that he desired a jury trial until the "eve of trial," when counsel allegedly unduly pressured him to waive his right.  Furthermore, the record supports the state court's determination that Petitioner freely and voluntarily waived his right to a jury trial. In the analogous context of a plea colloquy, the Supreme Court held that while the barrier to collateral relief posed by the record of a plea or sentencing proceeding is not insurmountable,

> [T]he representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

Blackledge v. Allison, 431 U.S. 63, 73–74, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977). In the instant case, Petitioner was able to coherently participate in the extensive colloquy conducted by the trial court and offered more than "yes and no" answers to the court's questions. He formulated proper responses to the questions and provided insight and explanations regarding his decision. Petitioner has come forward with nothing but self-serving allegations to show he was incapable of understanding the nature of the right he was giving up and the consequences of his waiving his right to a jury trial; nor has Petitioner brought forth anything but after-the-fact allegations of misconduct by defense counsel (specifically, undue pressure and refusal to honor Petitioner's request to file a motion for change of venue) to refute his sworn declaration to the trial court that no one forced him to waive his right to a jury trial. Therefore, Petitioner failed to demonstrate the state court's denial of his claim was contrary to or an unreasonable application of clearly established federal law.

    D.    <u>Ground Five: "Petitioner was denied effective assistance of counsel as guaranteed him under the 6th and 14th Amendments to the U.S. Constitution by counsel's failure to object to a garbled, unintelligible, and altered audio tape as it was admitted into evidence during the State's case-in-chief."</u>

        <u>Ground Six: "Petitioner was denied effective assistance of counsel as guaranteed him under the 6th and 14th Amendments to the U.S. Constitution by counsel's failure to object to inadmissible hearsay."</u>

Petitioner contends defense counsel was ineffective for failing to object to the admission of an audio-taped recording of his confession and a transcript of that recording (doc. 1 at 11–12). He asserts counsel should have objected to admission of the audio recording on the ground that it was garbled and unintelligible (*id.*). He contends counsel should have objected to admission of the transcript on the ground that it was inadmissible hearsay, because the person who prepared it did not testify, and the State failed to offer any evidence to establish the accuracy of the transcript (*id.*). Petitioner additionally asserts law enforcement altered the audio recording to remove any indication that the following event occurred during the interrogation:

> At one point during interrogation, after Petitioner had invoked his right to counsel, the police beat Petitioner and subsequently put a pistol into his mouth, cocked the pistol and stated, "you [sic] gonna talk or I'll blow your fucking brains out, just give us a damn confession."

(*id.*).  Petitioner contends was prejudiced by counsel's failure to object to admission of the audio recording, because the recording provided an inaccurate picture of his mental state at the time of the offense and the facts surrounding the events that occurred (*id.*).  He argues he would have been acquitted if counsel had objected to admission of the audio recording and transcript (*id.*).

Respondent argues Petitioner failed to set forth any meritorious basis for an evidentiary objection to admission of the audio recording or the transcript (doc. 11 at 21–24).  Therefore, the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).  Respondent additionally contends Petitioner's allegation of being forced to confess at gunpoint has no support in the record and is in fact contrary to the record (*id.*).  Respondent argues Petitioner had ample opportunity to present his allegations of a forced confession to the trial court, but he never did (*id.*).  Further, Petitioner stated under oath at the end of his recorded statement that he made the statement of his own free will (*id.*).  Therefore, his allegations should not be considered by this court (*id.*).

    1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

    2.    Federal Review of State Court Decision

Petitioner raised these claims as Grounds 1 and 2 in his second Rule 3.850 motion (Ex. AA at 202–08).  The state circuit court correctly cited the <u>Strickland</u> standard as the applicable legal standard (*id.* at 313).  The court adjudicated the claims as follows:

> In Ground One of his ineffective assistance claims, the Defendant argues that counsel was ineffective for failing to object to a "garbled, unintelligible, and altered audio tape" that was admitted into evidence.  He claims that the audio tape introduced by the State, which contains a confession by the Defendant, was altered prior to trial.  He states that during the confession, the police had coerced him, beat him and held a gun to his head.  However, he claims that the police were able to cover up this coercion by altering the tape.  The Defendant states that the only way the court reporter was able to transcribe the garbled audiotape was by following along with the State's prepared transcript of the audiotape, which is clearly noted in the transcripts. He also contends that Detective Nagy admitted that it was difficult

to listen to and that it was not "Bose quality." His attorney should have known that the tape was altered, and should have objected to the tampered evidence being introduced. Further, the Defendant alleges that the tape gave the fact-finder an inaccurate picture of the Defendant's mental state, which damaged his insanity defense. The Defendant appears to be contesting the introduction of an *audiotape* taken at the Bay County Sheriff's Office. However, Detective Nagy's statements concerning the poor audio quality were in reference to a *videotape* that was shown in its entirety at trial, which depicted the Defendant taking the police around the scene of the crime and explaining the surrounding events. (*See* Trial Transcript at 197–215.) The audiotaped confession was played at a later time, and was introduced into evidence during the direct examination of Sheriff Frank McKeithen. (*See* Trial Tr. at 222–256.) The Defendant has clearly confused the State's exhibits, as he relies on Detective Nagy's comments to support of [sic] his claim that audiotape was garbled, unintelligible, and altered. Thus, his claims are directly refuted by the record. Further, any claims of police coercing of his confession were raised and disposed of in his previous post conviction motion. (*See* Order Denying In Part and Directing State to Respond.) Finally, the Defendant claims that the introduction of his confession caused him prejudice by negating his sole defense of insanity, but he fails to allege how this negated his defense. As the Defendant has failed to establish either *Strickland* prong, Ground One is due to be denied.

In Ground Two, the Defendant argues that his attorney was ineffective for failing to object to inadmissible hearsay. According to the Defendant, the transcript of the confession was prepared by someone at the Sheriff's office, who did not testify at the hearing. Since the audiotape itself was impossible to understand, the Defendant claims that the transcript was not corroborated by the recorded confession and constituted inadmissible hearsay. He claims that he was prejudiced, since this transcript was used to establish the premeditation needed for a first degree murder conviction.

As established in the first ground, it was the videotape and not the audiotaped confession that was difficult to hear. Thus, there is no indication that the audiotaped confession was distorted or difficult to hear. Even without the transcript, the trier of fact could listen to the confession from the Defendant's own mouth and conclude that he premeditatedly [sic] murdered his wife. Moreover, the Defendant's sole defense at trial was that he was insane and that he planned to commit the murder with the help and cooperation of his wife to fulfill a "prophesy." The Defendant was not prejudiced, since premeditation was never the focus of the defense; the defense strategy was directed at proving the Defendant did not know his actions were wrong. (*See* Trial Tr. at 10-12.) Thus, Ground Two is without merit.

(Ex. AA at 314). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. EE).

The record demonstrates the state court was incorrect in its factual finding that Detective Nagy's statements concerning poor audio quality were in reference to a videotape that was shown at trial.  Investigator Nagy testified that the <u>audio tape</u> from the recorder in the tactical room, which he identified as State's Exhibit AT, "can be" difficult to listen to (Ex. D at 196–99).  He testified, ". . . you really have to listen.  If you listen to it you can hear clearly what is going on.  It is not Bose quality tape." (*id.* at 199).  Nagy also identified the transcript of the audio tape as State's Exhibit STMT and testified the statement was accurate (*id.*).  The State moved the audio tape and transcript into evidence (*id.*).  Defense counsel interposed no objection, except that the trier of fact be admonished that only the audio tape was to be considered evidence of the content of the confession (*id.*).  The trial court acknowledged the proviso (*id.*).  The audio tape was published to the trier of fact during Sheriff McKeithen's testimony (*id.* at 222–56).

However, the state court's incorrect finding as to this subsidiary fact (the tape to which Nagy was referring when he stated it was not "Bose quality") did not render the court's primary factual determination—that Nagy's testimony did not support Petitioner's allegation that the tape was garbled,  unintelligible, and altered—unreasonable.  Nagy testified the tape "can be" difficult to listen to, but he clarified, "If you listen to it you can hear clearly what is going on."  This testimony does not support Petitioner's assertion that the tape was garbled or unintelligible.  Further, the post-conviction court found there was no indication the audio-taped confession was distorted or difficult to hear.  The court additionally found that even without the transcript, the trier of fact could listen to the confession and draw conclusions as to Petitioner's guilt.  The judge who presided over the post-conviction proceedings was the same judge who acted as the trier of fact at Petitioner's trial and listened to the evidence.  Petitioner has not shown by clear and convincing evidence that the court's factual findings as to the clarity and intelligibility of the audio tape were unreasonable.  Therefore, he failed to show that defense counsel had a meritorious basis to object to the audio tape on the ground that it was garbled and unintelligible.

Further, Petitioner's allegation that the tape was altered is completely unsupported.  In support of this allegation, he states the tape completely omitted evidence that "police" beat him, put a pistol into his mouth, cocked it, and threatened to blow his brains out if he did not confess.  However, Petitioner's delay in mentioning such a dramatic event diminishes the veracity of his

allegations. Petitioner did not mention this event during pre-trial or trial proceedings, nor does he allege he informed defense counsel of it; he did not mention it in his first Rule 3.850 motion, even though he asserted a challenge to the voluntariness of his confession (*see* Ex. N); Petitioner did not even mention it in his original second Rule 3.850 motion (*see* Ex. AA at 27–60), filed on January 26, 2011. The first time he alleged this dramatic event was in his amended second Rule 3.850 motion, filed March 30, 2011 (*id.* at 161–234). It strains credulity to believe that such a dramatic event occurred during Petitioner's interrogation, yet he never mentioned it to defense counsel or during the several instances when he addressed the court during pre-trial proceedings, especially when he had to have known that disclosing such an event was a sure-fire way of obtaining suppression of his confession. Therefore, Petitioner failed to show that defense counsel had a basis to object to admission of the audio tape on the ground that it was altered.

Additionally, Petitioner failed to show that counsel had a meritorious basis for objecting to admission of the transcript on hearsay grounds. As previously discussed, Petitioner's admissions to Sheriff McKeithen and Investigator Nagy fell under the admissions exception to Florida's hearsay rule. *See* Fla. Stat. § 90.803(18). Furthermore, the transcript was properly identified and authenticated (Ex. D at 199). Moreover, counsel properly requested that the transcript be admitted with the proviso that only the audio tape was considered evidence of the actual content of the interview. Therefore, Petitioner failed to show deficient performance by counsel with regard to counsel's failure to object to admission of the audio tape and transcript.

E.  Ground Seven: "Petitioner was denied effective assistance of counsel as guaranteed him under the 6th and 14th Amendments to the U.S. Constitution by counsel's failure to challenge the indicia of reliability of his mentally insane client's statement to law enforcement."

Petitioner asserts defense counsel should have objected to admission of his confession on the ground that it was unreliable, because Petitioner was mentally insane and incompetent at the time he confessed (doc. 1 at 12–13).

Respondent contends this claim is procedurally barred (doc. 11 at 24–27). Respondent argues Petitioner did not present this claim in a context in which the merits could be considered, because he raised it in his second Rule 3.850 motion, and the state court found it procedurally barred as successive, on the ground that Petitioner had raised the claim in his first Rule 3.850 motion and

it was denied on the merits (*id.*). Respondent contends notwithstanding the procedural default, the claim should be denied for the reasons discussed in Ground Two, *supra* (*id.* at 27).

In Petitioner's reply, he contends the state court erroneously concluded he had raised the claim in his first Rule 3.850 motion (doc. 17 at 10–11). Petitioner contends the instant claim is entirely separate from his claim of ineffective assistance of counsel based upon counsel's failure to seek suppression of the confession (*id.*). He then attempts to clarify the instant claim, but he actually muddies the waters. He argues:

> The entire basis of the claim [raised here and in the second Rule 3.850 motion] was that Petitioner had substantial proof that he was severely mentally disturbed at the time of the alleged confession, therefore, any statements were inconsistent and unreliable. Petitioner went on to contend that had counsel moved the court to hold a hearing on the indicia or reliability of the statements, the court would not have been able to find this evidence competent enough to based an entire conviction on; with no substantiating evidence, there was no indications [sic] that the confession was compounded [sic] by evidence extrinsic to the statement itself. There was no evidence if it was false or not.

> Petitioner specifically argued that trial counsel could have moved the court to find if it contained indicia of reliability and whether or not any elements of the charged crime could be proven without the confession. As was asserted in the 3.850, had the evidence come in and had counsel impeached or challenged this evidence by showing that it was not reliable, there is a reasonable probability that the entire outcome of the trial would have been different.

(doc. 17 at 11). Petitioner's references to a hearing, combined with his explicit statement that he was not referring to suppression of the confession, suggest he is arguing that defense counsel should have filed a motion in limine to exclude the evidence on the ground that it was unreliable due to his mental illness. He also appears to argue that counsel should have impeached the confession with evidence of Petitioner's mental condition at the time of the confession. Therefore, the court will construe the claim as raising those arguments.

The state court properly treated Petitioner's first argument, that counsel should have filed a motion in limine to exclude the confession on the ground that it was unreliable due to Petitioner's mental illness, as raised and adjudicated in the first Rule 3.850 proceeding. In Florida, a defendant's motion in limine challenging the admission of his confession, is properly treated as a motion to suppress. *See* Rios v. State, 791 So. 2d 1208, 1210 (Fla. 5th DCA 2001). In Ground 1 of

Petitioner's first Rule 3.850 motion, he argued counsel should have moved to suppress his confession or challenged its admissibility on the ground that it was <u>involuntary</u> due to his mental illness (Ex. N at 85, 90–91). In his second Rule 3.850 motion, he rephrased his argument to contend counsel should have challenged the admissibility of his confession on the ground that it was <u>unreliable</u> due to his mental illness. However, the underlying facts and legal analysis are the same. For the reasons discussed *supra* in Ground Two, Petitioner failed to demonstrate the state court's adjudication of this claim was contrary to or an unreasonable application of <u>Strickland</u>.

As to Petitioner's argument that counsel was ineffective for failing to impeach the reliability of the confession with evidence of Petitioner's mental condition at the time of the confession, he failed to show counsel performed ineffectively in this regard. During cross-examination of Sheriff McKeithen, defense counsel elicited testimony suggesting Petitioner was mentally unstable at the time of the confession; specifically that Petitioner had cut himself on his testicles just prior to the interrogation, and he stated he communicated with others on a non-verbal level called "In Two" (Ex. D at 259–62). Additionally, defense counsel presented testimony from Dr. D'Errico that he examined Petitioner on April 4, 6, and 8, 2005, only five, seven, and nine days after Petitioner's confession (Ex. D at 397–98). Dr. D'Errico testified he was unable to have a normal conversation with Petitioner (*id.* at 398–98). He testified Petitioner had difficulty maintaining his train of thought, he sometimes attempted to speak in parables, he had a flat affect, and he exhibited disorganized thought, which is a symptom exhibited by people with schizophrenia (*id.* at 399–400). He testified he did not have the impression that Petitioner was malingering (*id.* at 400). Dr. D'Errico confirmed that based upon his meetings with Petitioner in early April, he and two other doctors agreed Petitioner was psychotic (*id.* at 401). He testified when he first saw Petitioner (five days after his confession), he appeared to have all the symptoms of paranoid schizophrenia, including auditory hallucinations, delusional thought patterns, unusual beliefs about reality, and loosely associated speech (beginning a sentence and shifting to another idea in the middle of it) (*id.* at 404). Dr. D'Errico testified he spoke with a newspaper reporter who interview Petitioner shortly after his arrest (Petitioner was arrested on March 27, 2005 (*see* Ex. C at 121)), and stated he had difficulty making sense of what Petitioner said (*id.* at 411–12). Dr. D'Errico testified he believed that Petitioner was suffering from paranoid schizophrenia at the time of the offense on March 21, 2005

(nine days prior to his confession) and during his meetings with Petitioner on April 4, 6, and 8, 2005 (*id.* at 418).

Counsel's presenting testimony from the Sheriff regarding Petitioner's self-harmful behavior just prior to the confession and his delusional statements during the confession, as well as counsel's presenting expert testimony that Petitioner was suffering from paranoid schizophrenia before and after his confession, thus suggesting he was suffering from it at the time of his confession, certainly impeached the reliability of the confession. Petitioner failed to show that counsel's failure to make additional efforts at impeachment was unreasonable. He further failed to show a reasonable probability that additional impeachment efforts would have resulted in a different outcome at trial. Therefore, Petitioner is not entitled to relief on Ground Seven.

    F.    <u>Ground Eight: "Petitioner was denied effective assistance of counsel as guaranteed him under the 6th and 14th Amendments to the U.S. Constitution by counsel's failure to conduct any real pretrial investigation and by failing to interview, depose, and call crucial witnesses to testify during trial."</u>

Petitioner asserts he advised defense counsel that his mother, Sheryl Taube, and his brother, Adrian Collier, would testify to his severe mental history (doc. 1 at 13–14). Petitioner states his mother would have testified: (1) Petitioner was sexually abused when he was thirteen-years-old, which led to a psychotic episode and multiple suicide attempts, (2) after that, he had an extensive history of psychosis and delusional thought patterns, (3) he had an extensive history of using crystal meth, which left him in a psychotic and irrational state of mind, and (4) he had received extensive psychiatric treatment since he was thirteen-years-old (*id.* at 13). Petitioner states his brother would have testified: (1) Petitioner had been a "total psychotic lunatic" since he was sexually abused, (2) for several years Petitioner had several involuntary hospitalizations, multiple suicide attempts, and extensive psychiatric treatment for mental illness, (3) Petitioner said things that made no sense and defied reality, (4) Petitioner used massive amounts of crystal meth and had overdosed on LSD when he was thirteen-years-old, and (5) Petitioner made unusual comments such as "the keys to the cosmos," "I'm God," and "the devil spoke to me today and we had lunch" (*id.* at 13–14). Petitioner contends this evidence would have substantiated his insanity defense, and there is a reasonable probability he would have been acquitted had counsel presented testimony from these two witnesses (*id.* at 14).

Respondent contends the state court's adjudication of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law (doc. 11 at 27–28).

1.　　　Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.　　　Federal Review of State Court Decision

Petitioner raised this claim as Ground 5 in his second Rule 3.850 motion (Ex. AA at 218–24). The state circuit court adjudicated the claim as follows:

> In Ground Five, the Defendant alleges that counsel was ineffective for failing to call witnesses who could have helped with his insanity defense. He specifically names his mother and his brother as two witnesses who were willing and able to testify to the Defendant's history of mental illness, sexual abuse, substance abuse, and suicide attempts. The Defendant further alleges that they could have provided evidence that his psychosis was present even when he was not on drugs. As prejudice, the Defendant argues that this testimony could have rebutted the psychologist's testimony that the Defendant was sane at the time of the offense.
>
> The Defendant does not allege that his mother and brother could have testified to any events or his mental state as of the day of the murder. Since nonexperts may give testimony regarding their personal observations gained only during the period proximate to the events giving rise to prosecution, the Defendant has not shown that his mother or brother would have been competent witnesses in this case. *See Owen v. State*, 986 So. 2d 534 (Fla. 2008) ("A nonexpert is not competent to give lay opinion testimony based on his personal observation that took place a day removed from the events giving rise to the prosecution. This is clearly the domain of experts in the field of psychiatry.") (quoting *Garron v. State*, 528 So. 2d 353, 357 (Fla. 1988)). As discussed in Ground Three, defense counsel called Dr. Michael D'Errico as an expert witness to testify to the Defendant's mental health history and his mental state at the time of the crime. Dr. D'Errico expounded on most of the issues that the Defendant alleges in his motion, including his psychiatric history, drug abuse, suicide attempts, and delusional thought patterns. (Tr. at 397–419.) Thus, the Defendant has not shown how his attorney was ineffective for failing to call these witnesses and has also failed to demonstrate prejudice. Accordingly, Ground Five is denied.

(Ex. AA at 316). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. EE).

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference. *See* Chandler v. United States, 218 F.3d 1305, at 1314 n.14 (11th Cir. 2000)

(citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518–19 (11th Cir. 1995) (en banc)). If the record is not complete regarding counsel's actions, then the courts should presume "that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some reasonable lawyer might do." *Id.* at 1314–15 n.15. "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Waters, 46 F.3d at 1514. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).

Initially, Petitioner's allegations regarding the substance of his mother and brother's proposed testimony is purely speculative. He offered nothing, in the form of affidavits or otherwise, to show that his mother and brother actually would have testified to the facts Petitioner alleges.

Additionally, this court must abide by the state court's interpretation of state law. *See* Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975). Therefore, this court is bound by the state court's determination that Petitioner's mother and brother were not competent to give lay opinion testimony as to Petitioner's mental state. Defense counsel cannot be deemed ineffective for failing to call a witness who could not provide competent testimony. Moreover, as the state court found, defense counsel presented competent, expert testimony regarding Petitioner's mental state at the time of the offense, which was the only evidence relevant to the insanity defense. Therefore, the state court's denial of this claim was not unreasonable.

G.  Ground Nine: "Petitioner was denied effective assistance of counsel as guaranteed him under the 6th and 14th Amendments to the U.S. Constitution by counsel's failing to move to suppress statements made during compelled psychiatric examinations."

Petitioner contends defense counsel should have moved to suppress Petitioner's incriminating statements to Dr. McClaren during McClaren's "compelled" sanity evaluation (doc. 1 at 14–15). The specific statements Petitioner contends should have been suppressed are (1) his statement that when he and the victim arrived at the location where he killed her, Petitioner first asked the victim for a "blow job," but the victim refused, and (2) his statement that if the victim had

given him a "blow job," he probably would not have killed her (*id.* at 14). He also contends Dr. McClaren's testimony that Petitioner's luring the victim to the crime scene and removing her reproductive organs was consistent with anger, rage, and jealousy over the possibility that the victim may have been carrying someone else's child, should have been suppressed (*id.*). Petitioner contends there is a reasonable probability he would have been acquitted had the statements been suppressed (*id.* at 15).

Respondent contends the state court's adjudication of Petitioner's ineffective assistance of counsel claim was not contrary to or an unreasonable application of clearly established federal law (doc. 11 at 28–30).

        1.       Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

        2.       Federal Review of State Court Decision

Petitioner raised this claim as Ground 6 in his second Rule 3.850 motion (Ex. AA at 224–27). The state circuit court adjudicated the claim as follows:

> In Ground Six, the Defendant alleges that counsel was ineffective for failing to suppress statements made by the Defendant during compelled psychiatric examinations. The Defendant asserts that Dr. Harry McClaren was appointed to examine him and was also used as the State's expert at trial. Dr. McClaren conducted several interviews with the Defendant and elicited incriminating statements that were then introduced at trial through his testimony. Specifically, the Defendant states that the doctor testified that the Defendant admitted he would not have killed the victim if she would have given him a "blow job." Additionally, the Defendant also takes issue with statements made by the doctor that the Defendant "lured" the victim out into the woods, and that his removal of her sexual organs was consistent with his jealousy or anger that she may be carrying someone else's child. The Defendant argues that these statements supported the State's theory of premeditation and the State's motive of anger or jealousy over the victim's pregnancy. Further, the Defendant argues that the admission of the "blow job" statements significantly undercut his insanity defense.
>
> The Defendant cannot show that his attorney was ineffective for failing to object to the admission of these statements. The Defendant is essentially arguing that the State should not have been allowed to present any statements from Dr. McClaren that rebutted the insanity defense. However, as the Defendant was allowed to present testimony from his own expert that raised a reasonable doubt as to whether the Defendant knew he was doing a wrongful act, the State must be

permitted to rebut the Defendant's evidence by presenting their own evidence of the Defendant's understanding of the nature of his actions and his perceived wrongfulness. *See Parkin v. State*, 238 So. 2d 817 (Fla. 1970). Statements introduced by Dr. McClaren were not intended to incriminate the Defendant, but were used as medical evidence in determining whether the Defendant understood right from wrong and whether he truly believed he was performing the murder to fulfill a "prophesy." Such statements are admissible since the Defendant waives his Fifth Amendment privilege against self-incrimination by making his mental illness an issue at trial. *Id.* at 822.

Additionally, the Defendant has not sufficiently established the prejudice prong of *Strickland*. As state[d] throughout his motion, the Defendant relied on an insanity defense as his sole defense, and it was never argued that he did not commit premeditated murder. In fact, there was overwhelming evidence adduced at trial, including Defendant's own confession, which connected the Defendant to the murder and established the premeditation necessary for a first degree murder conviction. The Defendant's own expert even discussed the Defendant's actions in connection to the murder, and agreed that the Defendant was "hyper aware of his actions because of this belief in this prophesy." (Tr. at 418.) Thus, the Defendant's argument that these statements made by Dr. McClaren prejudiced him by establishing premeditation and motive are without merit. *See Morgan v. State*, 639 So. 2d 6 (Fla. 1994). Finally, the Defendant's bare allegation that the "blow job" statement damaged his insanity defense by "inflaming the trier of fact" is conclusory and does not sufficiently state a claim for relief. Accordingly, Ground Six is denied.

(Ex. AA at 316–17). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. EE).

This federal court is bound by the state court's determination that Dr. McClaren's testimony regarding Petitioner's statements was admissible under Florida law. *See* <u>Bradshaw</u>, 546 U.S. at 76; <u>Mullaney</u>, 421 U.S. at 691. The court's determination on this state law issue is dispositive of Petitioner's federal claim, because counsel cannot be deemed deficient for failing to make a meritless objection. Therefore, the state court's adjudication of this claim was not unreasonable under <u>Strickland</u>.

H. <u>Ground Ten: "Petitioner was denied effective assistance of counsel as guaranteed him under the 6th and 14th Amendments to the U.S. Constitution by counsel's failure to impeach a key witness with prior inconsistent statements."</u>

Petitioner contends defense counsel was ineffective for failing to impeach testimony by Dr. D'Errico, a defense witness, with a prior inconsistent statement (doc. 1 at 15; doc. 17 at 14–16).

Petitioner asserts Dr. D'Errico initially opined in his report that "there is much data to support an adjudication of insanity defense in this case." (*id.*). However, at trial, Dr. D'Errico "recanted" his statement and testified Petitioner "knew what he was doing and the consequences of such behavior" and "knew that his actions during the time period of the alleged offense was [sic] against the law." (*id.*).

Respondent contends it was reasonable strategy <u>not</u> to seek to impeach Dr. D'Errico's credibility, because Dr. D'Errico's testimony supported Petitioner's insanity defense, and any attempt by defense counsel to impeach Dr. D'Errico with the prior statement would have been subject to objection as improper impeachment (doc. 11 at 31). Therefore, the state court's adjudication of Petitioner's ineffective assistance of counsel claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).

    1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

    2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground 7 in his second Rule 3.850 motion (Ex. AA at 227–29). The state circuit court adjudicated the claim as follows:

> In Ground Seven, the Defendant argues that counsel was ineffective for failing to impeach Dr. D'Errico with a prior inconsistent statement. The Defendant claims that Dr. D'Errico initially opined in his October 24, 2006 report that "there is much data to support an adjudication of insanity." However, at trial, the Defendant claims that Dr. D'Errico recanted his statement, asserting that the Defendant was aware of what he was doing and was aware of its illegality. Thus, the Defendant alleged that counsel's failure to impeach the doctor regarding his prior inconsistent statement significantly undercut his sole defense of insanity.

> Dr. D'Errico testified at trial that he evaluated the Defendant for the purposes of determining his sanity or insanity at the time of the offense. In his report he states that there was data to support an adjudication of insanity. At trial, he stated that the Defendant was aware of his actions, that he killed his wife, cut off her head and disemboweled her. (Tr. at 418.) However, the doctor then stated that the Defendant "probably" knew that what he did was against the law, but he believed that "he did something correctly according to his mind set at that time." (Tr. at 419.) Furthermore, when the State attempted to elicit from Dr. D'Errico that the Defendant appreciated the criminality of his conduct, the doctor would not give a definite[ ] answer as to whether the Defendant understood that murdering his wife was against

the law. (Tr. at 420.) Although the Defendant argues that Dr. D'Errico recanted his opinion that the Defendant could be adjudicated insane, it appears at trial [that] Dr. D'Errico actually supported the insanity defense. He stated that the Defendant believed that he was fulfilling a prophesy, and what he had done was correct in his mind. The Defendant has not shown how his attorney was ineffective for failing to impeach his own expert witness with a prior statement, as the statement appears to be consistent with this trial testimony. Thus, Ground Seven is denied.

(Ex. AA at 317–18). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. EE).

The state court's findings of fact as to Dr. D'Errico's trial testimony and the statement in his report are supported by the record (Ex. D at 418–20, Ex. AA at 236–43). In Dr. D'Errico's report dated October 24, 2006, he opined:

> As best as can be determined from all available information, it would appear that Mr. Collier likely suffered from symptoms of severe mental illness during the time period of the alleged offense, namely schizophrenia, paranoid type. Furthermore, Mr. Collier's behaviors during the time period of the alleged offense were likely directly related to his erroneously delusional belief in "the prophesy" .
> . . .
> . . . Forensic evidence in this case appears most closely associated with Mr. Collier's psychotically distorted interpretation of verses from the Book of Revelations compounded by other information he understood through his experiences of auditory hallucinations. Hence, there is much data to support an adjudication of insanity in this case.

(Ex. AA at 242–43).

At trial, Dr. D'Errico opined that at the time of the offense, Petitioner was suffering from paranoid schizophrenia (Ex. D at 418). He opined Petitioner knew that he was killing his wife, and he may have even been "hyper aware" of his actions because of his belief in "the prophesy" (*id.*). Dr. D'Errico testified "I believed that in his disordered mind he thought that he was doing the right thing for he and his wife." (*id.* at 419). When defense counsel asked whether Petitioner would have known that what he was doing was against the law, Dr. D'Errico responded, "I would say probably." (*id.*). On cross-examination, Dr. D'Errico did not agree with the prosecutor when the prosecutor asked whether he believed that Petitioner probably understood the criminality of his conduct (*id.* at 420). He also did not completely agree with the prosecutor when questioned as to whether some of

Petitioner's statements during his confession indicated he knew he did something wrong; instead, Dr. D'Errico testified, "At least he knows in the legitimate world it is wrong." (*id.* at 458).

"Any party, including the party calling the witness, may attack the credibility of a witness by: (1) Introducing statements of the witness which are inconsistent with the witness's present testimony." Fla. Stat. § 90.608(1). The theory of admissibility is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the trier of fact should disbelieve both statements. *See* Pearce v. State, 880 So.2d 561, 569 (Fla. 2004) (citation omitted). The prior statement must directly contradict, or be materially different from, the testimony offered at trial. *Id.*; *see also* Woods v. State, 92 So. 3d 890, 892 (Fla. 4th DCA 2012), *reh'g denied* (Aug. 13, 2012).

In the instant case, Dr. D'Errico's statement in his report that there was "much data to support an adjudication of insanity in this case" was not materially different from his trial testimony that Petitioner probably knew that his actions were wrong and illegal "in the legitimate world," but in Petitioner's paranoid schizophrenic mind, he believed his conduct was right for him and the victim in the world of "the prophesy." Further, because Dr. D'Errico was a crucial witness to Petitioner's insanity defense, it would not have benefitted the defense to suggest to the trier of fact that because Dr. D'Errico had not told the truth in one of the statements, the trier of fact should disbelieve both of his statements, which is the effect impeachment with the prior statement would have had. Therefore, defense counsel's failure to impeach Dr. D'Errico was not unreasonable.

Petitioner failed to demonstrate the state court's adjudication of this claim was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of Strickland. Therefore, he is not entitled to relief on Ground Ten.

I. <u>Ground One: "Petitioner was denied effective assistance of appellate counsel as guaranteed him under the 6th and 14th Amendments to the U.S. Constitution by counsel's failure to raise for appellate review the trial court's denial of motion for JOA."</u>

Petitioner asserts at the close of the State's case, defense counsel moved for judgment of acquittal ("JOA") on the ground that the evidence was insufficient to show premeditated murder (doc. 1 at 3). He states the trial court denied the motion (*id.*). Petitioner contends appellate counsel should have argued on appeal that the trial court erred by denying the motion for JOA, because the

State failed to present evidence showing he had time to reflect upon his actions and form a conscious intent to kill (doc. 1 at 3). He contends he would have succeeded on appeal had counsel argued this issue (*id.* at 4).

Respondent contends the state court's adjudication of Petitioner's ineffective assistance of counsel claim was not contrary to or an unreasonable application of clearly established federal law (doc. 11 at 32–37).

1.      Clearly Established Federal Law

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See* Smith v. Robbins, 528 U.S. 259, 285,120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citation omitted). As previously discussed, the two components of an ineffectiveness claim under Strickland are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other. Strickland, 466 U.S. at 697. The focus of inquiry under the performance prong of the Strickland standard is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691. Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal. Jones v. Barnes, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 3314, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). To demonstrate prejudice, Petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, Petitioner would have prevailed on appeal. *See* Robbins, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the Strickland standard with regard to claims of ineffective assistance of appellate counsel. Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit." United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)). Additionally, where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits. Diaz v. Sec'y Dep't of

Corrs., 402 F.3d 1136, 1142 (11th Cir. 2005); Atkins v. Singletary, 965 F.2d 952, 957 (11th Cir. 1992); Francois v. Wainwright, 741 F.2d 1275, 1285–86 (11th Cir. 1984). Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal. Nyhuis, 211 F.3d at 1344 (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988)).

2.       Federal Review of State Court Decision

Petitioner raised this claim in his state habeas petition (Ex. V at 19–29). The First DCA denied the petition on the merits (Ex. W).

The record demonstrates Petitioner's appellate counsel filed a merits brief raising one issue (Ex. E). Counsel argued the trial court abused its discretion by denying defense counsel's request for a special jury instruction stating, "A defendant may be considered legally insane where his ability to distinguish right from wrong has been destroyed as a result of a psychotic delusion that God has ordered him to commit a criminal act." (*id.*).

Petitioner failed to show a reasonable probability of success on appeal had appellate counsel argued the trial court erred by denying the motion for JOA on the ground that the State failed to present evidence showing he had time to reflect upon his actions and form a conscious intent to kill. Premeditation "is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." Miller v. State, 42 So. 3d 204, 228 (Fla. 2010) (quoting Asay v. State, 580 So. 2d 610, 612 (Fla. 1991)). "Circumstantial evidence of premeditation can include the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Pearce v. State, 880 So. 2d 561, 572 (Fla. 2004) (citing Spencer v. State, 645 So. 2d 377, 381 (Fla. 1994); Holton v. State, 573 So. 2d 284, 289 (Fla. 1990)). "Premeditation is a factual issue for the jury, Asay v. State, 580 So. 2d 610, 612 (Fla. 1991), and several standards of review are applicable." Twilegar v. State, 42 So. 3d 177, 190 (Fla. 2010), *cert. denied*, — U.S. —, 131 S.Ct. 1476, 179 L. Ed. 2d 315 (2011) (Mem). Where direct evidence of premeditation is presented, the "jury's finding of premeditation will be sustained if supported by competent, substantial evidence in the record." *Id.* However, in a case where the evidence of premeditation is entirely circumstantial, "not only must the evidence be sufficient to support the

finding of premeditation, but the evidence, when viewed in the light most favorable to the State, must also be inconsistent with any other reasonable inference." *Id.*

The State presented Petitioner's confession to Sheriff McKeithen that he strangled the victim with his hands until she stopped breathing, then cut her head off with a knife and shovel, and then cut her stomach (Ex. D at 223–27, 237–42). During his confession, Petitioner stated:

> And I walked down the path and into the woods or whatever and she said, I mean, I even In Two and In One [sic] I gave her the warning that . . . is this what you want me to do, asking her like that. And she said, yes. And we went and sat down on the couch over there in the trail and I told her, I, I [sic] sat down and I was like, baby, sit down or whatever. And she's, like, will you just fucking do it, just fucking do it. She just looked me in the eyes with everything, I said she just said [sic] just fucking to it. I, so I, I choked her out and—

(Ex. D at 236).

Dr. Siebert, the chief medical examiner and an expert in the field of forensic pathology, testified he examined the victim's body (Ex. D at 296–307). He testified the victim was decapitated (*id.*). He also testified he observed an incision in her chest extending from up near her rib cage down to her pelvic bone (*id.*). He testified the incision was deep and went all the way through to her internal organs and exposed her internal organs (*id.*). Dr. Siebert testified that in addition to the cut which opened up her body, there were three stab wounds over her left breast, one of which entered her heart (*id.*). He also testified the victim's uterus, fallopian tubes, and ovaries were missing (*id.*). Dr. Siebert testified that another doctor, Dr. Falsetti, performed a bone analysis and determined that a very sharp short-bladed knife, consistent with a pocket knife, was used to decapitate the victim's head, and a wider-bladed instrument, consistent with a shovel, was also used (*id.* at 308–10). Dr. Siebert testified it took "some amount of time" to cut through the victim's skin at her neck, and there were seventeen (17) cut marks to the bone, indicating "significant cutting" to the neck (*id.* at 309). Dr. Siebert testified the cause of the victim's death was stab wounds to the chest (*id.* at 307, 313). He testified he could not determine whether the victim was strangled, because the neck musculature was no longer available for examination due to the amount of decomposition of the body and the fact that the victim's head was not recovered (*id.* at 307). Dr. Siebert testified that if the stabbing was preceded by an attempt to strangle the victim to death, unconsciousness would occur in approximately 45 seconds (*id.* at 313–14).

Even assuming arguendo that the circumstantial evidence rule applied, there was competent, substantial evidence to support a finding of premeditation. Petitioner's admissions that he "gave [the victim] the warning that . . . is this what you want me to do," then choked her to unconsciousness, cut her head off, and stabbed her in the heart, together with Dr. Siebert's testimony that it would take approximately 45 seconds to render a person unconscious by strangulation, was competent, substantial evidence to support a reasonable finding by the trier of fact that Petitioner had a fully formed conscious purpose to kill, that is, he was conscious of the nature of the act he was about to commit and the probable result of that act. Petitioner thus failed to show a reasonable probability of success on appeal if appellate counsel had argued the trial court erred by denying the motion for JOA. Accordingly, the First DCA's denial of his claim was not contrary to or an unreasonable application of Strickland.

IV.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 28th day of November 2012.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).